Filed 9/13/23  In re Chan CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re | B324031 |
| HAU CHEONG CHAN | (Los Angeles County Super. Ct. No. BH014079) |
| on Habeas Corpus. | |

ORIGINAL PROCEEDING on petition for a writ of habeas corpus.  William C. Ryan, Judge.  Petition granted.

Rebecca N. Rabkin for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Amanda Jane Murray, Acting Senior Assistant Attorney General, Julie A. Malone and Jennifer O. Cano, Deputy Attorneys General, for Respondent.

————————————

This case arises from an armed robbery of a jewelry store committed by Hau Cheong (Peter) Chan and four confederates that ended in a bloody shootout in which a police officer and two of the robbers were killed, and another police officer and the

storeowner's son were shot and suffered serious injuries. It is undisputed that Chan "cased" the jewelry store, provided a gun to one of the robbers, and drove one of the getaway cars. Chan was convicted of second degree murder, two counts of attempted murder, assault on a police officer, and robbery, with true findings a principal was armed with a firearm. He was sentenced to 38 years four months to life in state prison.

Thirty-six years later (in 2021) the Board of Parole Hearings (Board) granted Chan parole, finding Chan had no violent rule violations in prison since 2000, had a low risk for violence, participated in numerous self-help programs, had an "excellent" release plan, and had made a conscious decision to stop his "criminal thinking" that led to his commission of the life crime. Chan described what he had learned in prison and expressed remorse for the "horrible murders," adding, "I am responsible for this terrible crime and I am truly sorry." However, Chan maintained the other robbers came up with the idea to rob the jewelry store, Chan provided a gun for use in the robbery only at the request of one of the robbers, and he was not inside the store during the robbery and ensuing shootout.

The Governor reversed the Board's decision, finding Chan had minimized his role in the life crime and failed to take full responsibility for his actions, therefore continuing to pose an unreasonable danger to society. In support of his decision, the Governor described Chan as having a significant role in the robbery and shootings, including joining his confederates in the "detailed" planning, providing "weapons" to the group, entering the jewelry store with his confederates, attempting to rob the owner and his son, and shooting at the two police officers. Parts of the Governor's version of the life crime are supported by the

2

appellate opinion affirming the conviction of Chan's codefendant (one of the robbers), which described Chan as "the leader of this congerie of crooks" and placed Chan inside the jewelry store during the robbery. However, other aspects—including that Chan shot at the police officers and provided more than one gun used during the robbery—are unsupported by the record.

Chan filed a petition for writ of habeas corpus requesting we reinstate the Board's finding that he is suitable for parole and order him released in accordance with the Board's decision. Chan contends his version of the life crime was plausible given that in response to a posttrial jury questionnaire all but one of the jurors indicated Chan was not the "mastermind" behind the robbery, and he was not inside the jewelry store while the robbery took place. Given the plausibility of Chan's account and California's prohibition against requiring an inmate to admit to an official version of the life crime (see Penal Code § 5011, subd. (b)),[1] the Governor improperly inferred Chan lacked insight based on the official version of the life crime. Further, even if we were to accept the Governor's finding that Chan lacked insight into the life crime given his minimization of his role, Chan has taken full responsibility for the deaths and other harm he caused. Therefore, even if there is evidence of lack of insight, it does not satisfy the requirement that the Governor's finding of current dangerousness must be supported by some evidence. As the Supreme Court held in *In re Shaputis* (2011) 53 Cal.4th 192, 219 (*Shaputis II*), "lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative

---

[1]    Further undesignated statutory references are to the Penal Code.

3

of the inmate's current dangerousness." We grant the petition, reinstate the Board's decision, and direct the Board to conduct its usual proceedings for release on parole.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Commitment Offense*

Because the Governor's decision reversing parole rested on the differences between the Governor's version of the crime and Chan's version, we provide descriptions of the crime from (1) this court's opinion affirming codefendant Nam Chinh's convictions at the joint trial with Chan (*People v. Chinh* (Apr. 28, 1993, B035806) [nonpub. opn.] (appellate opinion)); (2) the probation officer's 1998 presentencing report for Chan; and (3) Chan's testimony and written statement presented at his 2021 parole hearing.

1. *The appellate opinion affirming Chinh's conviction*[2]

On the morning of December 17, 1984, Chan and four others—Robert Woo, John Cheong, Sang Nam Chinh, and Thong Huynh—robbed the Jin Hing jewelry store in Chinatown. Huynh testified for the prosecution "in return for immunity as to not only for this crime but also for previous crimes."

Chan had a "sizeable gambling debt" and "[a]rmed robbery was his mode of choice to pay his debts." Chan was "the leader of

---

[2] Chan and Chinh were tried together before separate juries. Because Chan addressed in his letter to the Board the appellate opinion in Chinh's appeal, we assume the opinion was available for the Governor to consider. There does not appear to be an appellate opinion addressing an appeal by Chan.

4

this congerie of crooks."  The five men met at Huynh's house where "[t]hey planned the manner and details of how they were to rob the store and make their getaway."  The plan called for Woo, Cheong, and Chinh to enter the store, while Huynh stood guard outside with an Uzi sub-machine gun.  Chan had "'cased'" the jewelry store, and he told the other men that only the store owner and one employee would be inside.  Chan also estimated how long it would take for the police to arrive.

On the day of the robbery, Chan rented a getaway car and drove by the jewelry store to see if it was open.  A second getaway car, to be driven by Huynh, was parked behind the jewelry store.  According to Chan's plan, one getaway car would carry away the stolen jewelry and the other would carry away any hostages.  Chan bought hair mousse to disguise the appearance of one of the robbers.  He drove the robbers to the jewelry store and told Cheong and Woo to enter the store first, followed by Chinh.  He directed Huynh to wait outside in the second car until the robbers came out of the store.

When the robbers first entered, Leon Lee, the store's owner, his son, Robert Lee, and Betty Yip were in the store.  Several customers entered the store during the robbery.  Chan then entered the store to determine what was causing the delay.  Robert Lee activated the silent alarm, and Officers Duane Johnson and Archie Nagao responded to the scene.  Cheong let them in the store.  A gun battle ensued.  Chinh shot and killed Officer Johnson.  Robert Lee heard Chinh coming up the back stairway and tried to stop him by jabbing Chinh with a broom.  Chinh shot Robert Lee in the chest, severely injuring him.  Chinh suffered injuries from the gunfire to his chin and backside.  Leon Lee shot and killed Woo.  Cheong shot and injured Officer Nagao,

who returned fire and killed Cheong. Chinh fled the scene in Huynh's getaway car, and "Chan fled unharmed from the gun battle."

2. *The presentencing probation report for Chan*

The probation report prepared for Chan's December 16, 1998 sentencing hearing states, "[The] People's version of the case . . . has always been that Peter Chan was admitted to the store a short time later and was also armed with a gun. [The] [j]ury, however, rejected this version." The report adds, "Victim, Robert Lee, testified in court that he was in the rear of the store and grabbed a broom and tried to stop defendant Chan, as he was fleeing toward the rear door . . . . Further, that defendant in return, pointed a gun at the victim before fleeing out the rear door. His testimony was rejected by the jury." Chan was interviewed for the probation report. He told the probation officer that "he became involved in the life crime because he 'got greedy,' and that they anticipated getting "'maybe $40,000 or $50,000.'" Chan explained that "Woo talked him into participating in the robbery and had [Chan] 'case the shop' . . . ." Chan "denie[d] ever being in the store on the date of the robbery" but admitted he drove three of the robbers to the jewelry store and waited outside in the car. Chan explained that after waiting outside for 15 minutes, he became impatient and drove around to see what was happening. He heard the police sirens and drove off. Chan submitted a handwritten statement to the trial court, in which he "maintain[ed] that he was never inside the jewelry store, 'didn't hurt anybody' and was not 'the mastermind' of the robbery."

6

A court-ordered jury questionnaire was mailed to the 13 jurors.[3] The questionnaire asked: "Did you believe that Peter Chin [sic] was inside the jewelry store during the robbery murder?" and "Did you believe that Peter Chan was the mastermind of the robbery murder?" Twelve jurors responded no to both questions, and one responded yes. In response to the question, "What weight did you give to the testimony of Thong Huynh?," 12 jurors answered "very little," and one juror indicated "a great deal."

3. *Chan's testimony and written statement at the 2021 parole suitability hearing*

At the 2021 parole suitability hearing, Chan testified that he met Woo in Chinatown in New York about a year before the robbery. Chan's then-wife was good friends with Woo's and Cheong's girlfriends. At the time of the robbery, Chan had returned to California and was living with his wife, their son, and Chan's family. Chan was part owner of a company in the food business, but he was looking for an opportunity to make extra money by selling stolen merchandise.

A couple of weeks before the robbery, Woo told Chan about his plan to rob a jewelry store. Woo asked Chan to "case" the Jin Hing jewelry store. Chan did and reported back that "the store was small, but there's a lot of jewelry." Shortly thereafter, Woo decided the Jin Hing jewelry store would be the target. Chan testified that Woo asked Chan to pick him up, and "initially I was

---

[3] We assume the questionnaire was mailed to the 12 jurors and an alternate.

7

hesitant because . . . I didn't want to put myself in harm's way." Woo told Chan that he could sell the stolen jewelry, and Chan thought "the more help" he provided, the more money he would make. Woo then asked Chan for his gun (which Chan had purchased from his business partner). Woo explained to Chan that he wanted a gun because Woo did not trust Chinh, who would be bringing a gun. Chan hesitated because he was afraid the gun could be traced back to him, but Woo assured Chan the serial number would be sanded down. Chan then gave Woo his gun.

On the day of the robbery, Chan and the other robbers had a meal together, then Chan drove to the robbery location. Chan and Huynh were the getaway drivers. Chan was supposed to pick up Woo, and Huynh would pick up Cheong and Chinh. Chan waited in his car but became concerned after 10 or 12 minutes had passed and Woo had not returned. Then Chan saw a police car with its siren on, and Chan began circling the area in his car. Chan saw more police cars and decided to leave. Huynh paged Chan, and Chan called him back and learned that some of the men had been shot. Chan then headed to Huynh's apartment. When Chan arrived at the apartment, he saw that Chinh had been hurt, and Huynh asked Chan to go to the Chinese market to buy some medicine that would stop the bleeding. Chan returned with the medicine, and Huynh told Chan he had "a couple of guns" he wanted Chan to move to a friend's house in case the police searched his home. Chan was arrested after midnight while driving on the freeway.

The presiding commissioner then asked Chan to talk about the impact of the crime and the gravity of the offense. Chan responded, "Because of my actions, . . . Officer Johnson died and

was murdered . . . [at] the age of 27 . . . . I can't even put into words how that impact . . . and harms that I've done to, to his family . . . ." Chan described the very serious injuries sustained by Officer Nagao and Robert Lee (Lee), acknowledging, "many people . . . were . . . affected by this crime . . . because of my actions." The presiding commissioner asked whether Chan expected the use of guns and whether, after providing a gun to Woo, the robbers "were going to need to use the guns." Chan answered, "Oh, no. I . . . was in denial at the time . . . .I didn't think of that kind of stuff. . . . I should have known, I knew better. I was a criminal. [A]t the time I was busy thinking . . . I just help him a little bit, you know, and, and how I'm going to benefit, how I'm going to own that stuff. . . . I have no empathy. . . . I have no regard for other people['s] well-being. [A]nd then my selfish thought was like, . . . I'm not putting myself at risk, . . . but I did not care . . . the other people had risk. . . . I knew what could have happened. You're right."

Chan submitted to the Board a three-page, single-spaced typed statement explaining the robbery and his role in it. Chan's written description was consistent with his testimony at the parole hearing. Chan provided additional details in his typed statement, including that when he and Woo first discussed the robbery, Woo explained Huynh would provide two guns, Huynh would guard the hostages at gunpoint, and Woo and Cheong would take the jewelry. Huynh and Cheong would leave in a rental car, and Chan and Woo would leave in another car. Woo assured Chan he could park a safe distance away. Chan wrote, "I was a little bit worried about exposing myself to risk of getting caught, but my greed and my need for approval [were] very strong and I told myself I won't get caught."

When Chan was at Huynh's apartment after the robbery, Huynh asked Chan to help him move his Uzi and other guns to a friend's home, in case the police searched Huynh's apartment. Chan went to Woo's apartment, but Woo was not there. Chan was driving home when he was arrested on the freeway.

### 4. *Chan's conviction and sentence*

A jury convicted Chan of second degree murder (§ 187, subd. (a)),[4] two counts of attempted murder (§§ 187, subd. (a), 664), assault with a firearm on a peace officer (§ 245, subd. (c)), and robbery (§ 211). The jury found true as to the murder and attempted murder counts that a principal was armed with a firearm (§ 12022, subd. (a)), and with respect to the robbery that Chan personally used a firearm in the commission of the offense (§ 12022.5, subd. (a)). Chan admitted he suffered a prior conviction of a serious felony (§ 667, subd. (a)(1)). The trial court sentenced Chan to an aggregate sentence of 38 years four months to life in prison.

### 5. *The 2018 Parole Decision*

The California Department of Corrections and Rehabilitation received Chan on February 1, 1989. Chan became eligible for elderly parole consideration on October 15, 2015. In November 2018 the Board denied parole for three years, in part due to Chan's "criminal thinking."

---

[4] Chan was charged with three murders but convicted of one.

10

B.     *The 2021 Parole Suitability Hearing*

At the time of the 2021 parole hearing, Chan was serving sentences for the jewelry store robbery and the 1984 armed robbery of a seafood distribution company.  The Board considered Chan's central file and his comprehensive risk assessment dated February 28, 2017.  The Board also reviewed the confidential portion of Chan's central prison file, but the presiding commissioner clarified that the Board's decision was not based on any confidential information.

Chan provided additional testimony and documents for the parole hearing, including his attorney's cover letter; reentry support letters; a typed statement about his life crime (discussed above); handwritten statements of remorse and accountability; a summary of his self-help efforts; book reports and reflections; his relapse prevention plan; and post-release plans.

1.     *Comprehensive risk assessment and criminal history*

In February 2017 an evaluating psychologist prepared a comprehensive risk assessment that considered historical, clinical, risk management, and elderly parole factors to analyze Chan's risk of future violence.

The risk assessment provided information on Chan's upbringing and criminal history.  Chan was born in Hong Kong in 1955 and immigrated to the United States with his family when he was about 18 years old.  He received his high school diploma in 1975.  Once in the United States, Chan "gravitated toward delinquent peers" and participated in illegal activities for financial gain.  These activities included gambling, weapon sales, robberies, burglaries, selling stolen merchandise, and helping Woo run a prostitution ring.  In 1976 Chan pleaded guilty to an

armed robbery he committed with an accomplice in New York, for which he was sentenced to state prison and later paroled.

On December 1, 1984, several weeks before the robbery of the Jin Hing jewelry store, Chan and an accomplice entered a seafood distribution company while armed where two men were working. Chan and the accomplice demanded the men's jewelry, including a watch and gold chain, and money. The stolen Rolex watch was later discovered in Chan's home following the jewelry store robbery. Chan was convicted of armed robbery.[5]

The psychologist concluded Chan presented a "[l]ow risk for violence," meaning he presented with "non-elevated risk relative to long-term inmates and other parolees." (Boldface omitted.) The psychologist noted Chan's "disciplinary history revealed some struggles with difficulties complying with well-established prison rules," but the psychologist commended Chan for the absence of any violent behavior while in prison since 2000. With age, Chan gained greater self-control and behavioral stability, and "curbed his recklessness and impulsivity." He showed development in pausing and reflecting before acting, accepting critical feedback, and improving his work ethic. Chan "spoke candidly" and expressed regret and remorse about his commitment offense and other offenses. "His regret over the magnitude of the losses, which transpired as a result of this crime, was apparent during this assessment." Chan's placement score of 19 was the lowest possible given his commitment offense.

---

[5] According to the cover letter from Chan's attorney submitted for the parole hearing, Chan denied he had participated in the seafood company robbery, admitting only that he had purchased the stolen watch to resell it at a profit.

The risk assessment addressed Chan's 2011 rule violation report (RVR) for removing a witness statement.[6] Similar to his statements at the parole suitability hearing, Chan "'justified' his actions believing that he was 'wronged' by the system and needed 'to fix it.'" The psychologist noted Chan "demonstrated his criminal thinking" when he removed the witness statement from his central file, "[b]ut to his credit, he maintained behavioral stability since 2011." The psychologist observed, "[D]espite his occasional lapses of judgment, especially in the last few years, he presented with pro-social orientation, motivation to grow and to change and his willingness to address problematic behaviors. . . . He also reflects upon his decisions and how they are going to impact people around him, which is a marked change since the time he committed this crime."

### 2. *Rule violation reports*

From 1993 to 2011 Chan received five RVRs for gambling and possessing gambling paraphernalia (1993), participation in a riot (1999), battery on an inmate with a deadly weapon (2000), possession of a cell phone (2011), and theft of state property (2011).

---

[6] "[A]n RVR is issued for a serious rules violation. The California Code of Regulations gives a non-exhaustive list of examples of serious rules violations to include such circumstances as: use of force or violence against another person, a breach of or hazard to facility security, a serious disruption of facility operations, manufacturing a controlled substance, and willfully inciting others to commit an act of force or violence." (*Quiroz v. Horel* (N.D.Cal. 2015) 85 F.Supp.3d 1115, 1143; see Cal. Code Regs., tit. 15, § 3315, subd. (a) ["Serious Rule Violations"].)

The RVR for theft of state property was based on Chan's removal of a witness statement from his case file when he gained access to his file as part of his *Olson* review.[7] The witness stated Chan was inside the jewelry store at the time of the robbery. Chan testified at the parole hearing that at the time he removed the document, he thought he had been wronged by the witness, the statement was an "injustice," and Chan's "emotions got the best of" him. Chan "felt like . . . that piece of the document . . . [was] already proven . . . to be inaccurate, to be wrong, you know, and why was it still in my C-File so I used that justification." Chan explained he "didn't know how to trust the process" and took matters into his own hands. Chan explained he "was wrong" and "that was when I recognized [I had]. . . several problems that I still have . . . . I had [an] emotional problem." Chan stated that at the RVR hearing, he admitted he "was guilty" and did not provide "any excuse or explanation."

3. *Statements of remorse and accountability*

Chan submitted a six-page handwritten statement of his remorse and accountability. Chan stated, "I am responsible for this terrible crime and I am truly sorry." He acknowledged his criminal lifestyle at the time of the jewelry store robbery and added, "Because of my greediness, I decided to [be] involve[d] and [take] many parts in this jewelry store robbery." Chan explained, "I did not care about what happen[ed] to my crime partners or

---

[7] During an *Olson* review, an inmate's counselor allows the inmate to see the information contained inside the inmate's prison file, except for confidential sections. (*In re Olson* (1974) 37 Cal.App.3d 783, 784-785; Cal. Code Regs., tit. 15, § 3370, subds. (c) & (d).)

14

anyone else inside the store since my safety was not at risk.  I knew what could happen in an armed robbery with loaded weapons but I did not wan[t] to think about that because my mind was busy thinking of how to scheme for more money in the sale."  Chan explained that utilizing the tools he had gathered in prison participating in self-help programs, he now understood his motivations for committing the jewelry store robbery and was able to identify the "minimizing and blaming denial defects [that] took [him] many years to overcome."

In summarizing his "accountability," Chan wrote, "I cased the Jin Hing store, I provided a gun to Robert Woo, and I agreed to be a getaway driver for Robert Woo.  I provided encouragement to my crime partners and they also knew I was willing to fence the stolen merchandis[e] so we could all profit financially.  Without me, this robbery and the horrible murders could not [have] happened.  I chose to play all these roles in the crime because I was greedy, I didn't care about the law and I had no concern for people impacted by the crime."  Chan concluded, "Because of my actions [and] based on my insecurity, greed and lack of concern for other people, a young police officer was killed, another police officer was badly injured, innocent people were severely harmed and many families were traumatized.  The whole community was traumatized as well.  My decision to be involved in this crime will forever be my biggest regret."

4.    *Self-help efforts*

Chan participated in numerous rehabilitation programs while in prison.  The Board commented that it appeared Chan had "taken every self-help program that's become available" to him throughout the last 10 or 15 years.  Chan completed a long-

15

term offender program titled Denial Management, which helped Chan identify "denial defects" like "blaming, . . . rationalizing, [and] minimizing," which prevented him from coming to terms with his conduct for a long time. In 2012 and 2013, Chan participated in the Alternatives to Violence and Criminal Gangs Anonymous programs, which addressed how to avoid criminality and tendencies to commit crimes as a result of greed, laziness, dishonesty, and the need for approval.

Since Chan's previous parole suitability hearing in November 2018, Chan completed the Victim's Impact program. He also continued to participate in other programs, including Guiding Rage into Power (focusing on the harm he had caused); the Getting Real program (reflecting on past choices and building mindfulness and emotional intelligence tools to respond to situations); and Alcoholics Anonymous. Although in-person programming had been shut down since March 2020 due to the COVID-19 pandemic, Chan continued to participate in self-help programs through mailed lessons from the program sponsors, including programs on anger management, denial management, and calming techniques. Chan read books about self-improvement and spirituality, and he prepared book reports about the lessons he had learned.

5. *Relapse prevention and post-release plans*

Chan had in place comprehensive relapse prevention and post-release plans for living in both the United States and Hong Kong. Chan submitted more than 20 letters in support of his release on parole from family members, including his mother, brother, and son; individuals who worked with the self-help and educational programs in which Chan had participated; and

16

previously incarcerated individuals who explained how Chan had helped them while they were in prison.  He also submitted letters from four residential programs offering housing and self-help programs upon release on parole, with statements of eligibility for the programs.

6.    *Statements from the victims, their families, and the public*

At the hearing, the victims, their families, and the public provided extensive oral and written statements expressing the ongoing, devastating impact the crimes committed by Chan and the other robbers had on their lives.  Pamela DeLong, Officer Johnson's sister, expressed how Chan deprived Officer Johnson's then-unborn daughter of a father and the continued anguish felt by the family.

Los Angeles Police Detective Joshua Byers described the impact on him of having to inform Officer Johnson's widow, Kathleen Johnson, about Officer Johnson's death.  He also described his recent conversation with Kathleen Johnson in which she stated she wanted Detective Byers to carry on her fight because "she couldn't do it anymore."  Detective Byers read a letter from Officer Nagao, who expressed his belief that at the "trial of Chan and Nam Chinh, it was obvious that the man behind the robbery was this inmate, Chan."  Los Angeles Police Detective Cory Farell read letters from Kathleen Johnson and Officer Johnson's daughter Rachel, expressing their grief and hardship living without Officer Johnson.

Victim representative Larry Morrison read letters from Officer Johnson's brothers, Sam Johnson Culwell, Dana W. Johnson, and Lee.  Culwell explained he had faced depression

17

and anxiety since his brother's murder. Dana Johnson stated that when Chan shot his brother, "he in essence shot me as I did feel a change in my emotions up when he died. I suffer[] to this day."

Lee described the impact of the crime on his brother Norman, who, after learning of the robbery and coming to the store (which was by then a crime scene), was not allowed inside and instead stood outside the store for several hours in the rain. Norman became ill and never recovered, dying four years later at the age of 50. Lee also described the impact of the crime on Officer Nagao, who "never fully recovered" and suffered post-traumatic stress disorder. Lee described being inside the jewelry store when he heard footsteps coming up the stairway, and he "grabbed a broom and jab[bed] into the stairwell to keep [the robbers] away," hitting someone with the broom. Lee described how another person came up the stairs and shot him in the side of his chest. He expressed the "terrible guilt" he continued to feel for pushing the silent alarm and, as a result, "ruin[ing] the lives of [the] two policemen who responded to it." Lee referenced a book written by Chan's defense lawyer, which included a chapter about the robbery. According to Lee, Chan's defense attorney stated in the book that "Chan maintained that while he planned the robbery, he was not in this [store on] the day of the robbery. This lie became the basis for [the attorney's] brilliant defense."

### 7. *The Board's decision*

Using its structured decision-making tool, the Board concluded Chan did not pose an unreasonable risk to public safety and was suitable for parole. The Board identified the evidence it used to reach its decision, including information from

Chan's central file, comprehensive risk assessment documents submitted in preparation for the hearing, written responses from the public, Chan's hearing testimony, statements from the victims' families, and "information in the chart from the District Attorney's [o]ffice."[8]

The Board identified Chan's "criminal attitude" and his criminal and parole histories, including his lack of self-control at the time of the robbery and association with peers engaged in criminal and antisocial behavior, as negative factors not supporting a grant of parole.

The Board determined, however, that the positive factors outweighed the negative factors. Chan's comprehensive risk assessment indicated a low risk for violence, and Chan demonstrated positive behavioral changes since 2011. Chan's participation in work and self-help programs also mitigated his risk of violence. Regarding work assignments, the Board noted "a lot of positive work Chronos," "a strong work ethic," and "conscientious[ness]."[9] The Board commended Chan for continuing his participation in self-help programs despite the COVID-19 pandemic, adding that "throughout the last . . . 10 to 15 years, it looks like you've taken every self-help program that's

---

[8] The District Attorney was not represented at the hearing. Although the presiding commissioner referenced information in a "chart" provided by the District Attorney, the chart is not in the record.

[9] "A 'chrono' is an institutional documentation of information about inmates and inmate behavior." (*In re Shelton* (2020) 53 Cal.App.5th 650, 658, fn. 6; see Cal. Code Regs., tit. 15, § 3000 [definition of "General Chrono"].

19

become available to you. And you've learned each time." The Board pointed out Chan had no violent RVR's since 2000, and around 2011 or 2012 Chan "made a conscious decision" to stop his "criminal thinking." Specifically, Chan was able to articulate clearly the kind of person he was when he arrived at prison, including his "criminal thinking attitude," and how he had changed over the years to become an "empathetic, caring person" who wants to help others. The Board noted Chan's "excellent" release plan, whether in the United States or Hong Kong, including evidence of a strong family support system.

C.     *The Governor's Reversal of the Board's Decision*

On September 17, 2021 the Governor reversed the Board's decision granting parole. The Governor acknowledged Chan had participated in significant self-help programming, including an intensive anger management group and three vocational programs, and he had been regularly employed while in prison until a medical limitation in 2016. But the Governor concluded these positive factors were outweighed by the fact he had minimized his role in the crime and failed to take full accountability for the crime, making him unsuitable for parole.

In the statement of facts, the Governor described Chan's life crime: "In 1984, Hau Chan and his three crime partners made detailed plans to rob a jewelry store. On the day of the crime, they entered the store and attempted to rob the store owner and his son. Two police officers responded to a silent alarm and Mr. Chan and his crime partners shot at them. One police officer and two of Mr. Chan's crime partners were killed. The second police officer, the son of the store owner, and Mr. Chan's third crime partner were shot but survived their

20

injuries.  Mr. Chan was in the store during the robbery and served as the getaway driver."

The Governor stated as to Chan's minimization of his role in the life crime:  "In his past parole hearings, Mr. Chan minimized his role in the crime.  This continued at his most recent hearing in 2021, during which Mr. Chan reported that it was his crime partners['] idea to rob the jewelry store and that Mr. Chan cased the store only after he was asked."  Chan told the Board that "he had not wanted to be involved in the life crime, saying, '[I]initially I was hesitant because, uh, I didn't want to put myself in harm's way.'"  Chan claimed "he did not offer to provide guns during the crime, but instead his crime partner insisted that he do so.  Despite furnishing the group with weapons, Mr. Chan denied knowing the firearms would be used during the robbery.  When commissioners confronted him with whether he expected his crime partners to use the guns he said, "'Oh, no. . . .  I was in denial at the time. . . .  I didn't think of that kind of stuff. . . .  I should have known, I knew better.  I was a criminal.'"

The Governor noted that "Mr. Chan's efforts to avoid full accountability for the crime resulted in him being disciplined for removing a document from his permanent file without permission."  As discussed, the document Chan removed in 2011 was a witness statement placing Chan in the jewelry store during the robbery (contrary to Chan's insistence he was never inside the store).  The Governor explained that in 2017 Chan told the evaluating psychologist that he took the document because "he felt wronged by the system," and he similarly explained to the Board that at the time he thought the statement was an "injustice," and his "emotions got the best of [him]."

21

The Governor acknowledged "[t]he law does not require that Mr. Chan admit guilt for actions he did not commit. However, he must demonstrate sufficient insight into his role in the crime in order to avoid repeating the same thinking and conduct errors that resulted in the death of three people." The Governor concluded, "I have considered the evidence in the record that is relevant to whether Mr. Chan is currently dangerous. When considered as a whole, I find the evidence shows that he currently poses an unreasonable danger to society if released from prison at this time. Therefore, I reverse the decision to parole Mr. Chan."

D.    *Chan's Habeas Petitions*

On June 9, 2022 Chan filed a habeas petition in the superior court challenging the Governor's reversal of the Board's decision granting parole. The superior court denied the petition, concluding "the record contains some evidence in support of the Governor's decision" and "there is a rational nexus between the evidence in the record and the Governor's determination of Petitioner's current dangerousness."

In October 2022 Chan filed this habeas petition. After receiving an informal response from the Attorney General and Chan's reply brief, we issued an order to show cause why the relief sought in the petition should not be granted.[10]

---

[10]    Prior to issuing the order to show cause, we requested supplemental briefing on whether Chan's petition should be dismissed as moot in light of the Board's December 2022 denial of parole. The Attorney General and Chan agreed the subsequent denial of parole did not moot Chan's petition.

**DISCUSSION**

A.    *Governing Law and Standard of Review*

The granting of parole is the norm, not the exception.  *(In re Lawrence* (2008) 44 Cal.4th 1181, 1211 *(Lawrence)*; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 683.)  Section 3041, subdivision (a)(2), provides that "[o]ne year before the inmate's minimum eligible parole date . . . [the Board] shall *normally* grant parole . . . ."  (Italics added.)  The governing regulations provide guidance to the Board about the circumstances "[t]ending to [s]how" the suitability or unsuitability of granting parole.[11] (Cal. Code Regs., tit. 15, § 2402, subds. (c) & (d).)  For inmates eligible for elderly parole consideration, the Board must also consider the factors set forth in section 3055.[12]  "[T]he

---

[11]    The factors tending to show suitability include no juvenile record, stable social history, signs of remorse, motivation for the crime, battered woman syndrome, lack of criminal history, age, understanding and plans for the future, and institutional behavior.  (Cal. Code Regs., tit. 15, § 2402, subd. (d).)  The factors tending to show unsuitability include the commitment offense (whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner"), previous record of violence, unstable social history, sadistic sexual offenses, psychological factors, and institutional behavior.  (*Id.*, § 2402, subd. (c).)

[12]    Inmates who are 50 years of age or older and who have served a minimum of 20 years of continuous incarceration on their sentences are eligible for elderly parole consideration. (§ 3055, subd. (a).)  By his 2021 parole suitability hearing Chan had served more than 30 years of his sentence and was 65 years old.  Although the Governor did not address elderly parole factors in his decision, Chan does not contend in this proceeding that the Governor failed under section 3055, subdivision (c), to give

23

fundamental consideration in parole decisions is public safety"
and "involves an assessment of an inmate's *current*
dangerousness." (*Lawrence*, at p. 1205.) "[T]he mere presence of
a statutory unsuitability factor" is not enough. (*Id.* at p. 1210.)
Rather, there must be "'reasoning establishing a rational nexus
between those factors and the necessary basis for the ultimate
decision—the determination of current dangerousness." (*Ibid.*)

The Board's decision whether to grant parole for an inmate
serving an indeterminate life sentence for murder is subject to
review by the Governor. (§ 3041.2, subds. (a), (b) [the Governor
"shall review materials provided by the [B]oard," and if the
Governor modifies or reverses the Board's decision, the Governor
"shall send a written statement to the inmate specifying the
reasons for his or her decision"].) Under Article V, section 8,
subdivision (b) of the California Constitution, "[t]he Governor
may only affirm, modify, or reverse the decision of the parole
authority on the basis of the same factors which the parole
authority is required to consider." (See *In re Rosenkrantz, supra*,
29 Cal.4th at pp. 663-664; *In re Butler* (2014) 231 Cal.App.4th
1521, 1531.) However, "the Governor undertakes an
independent, de novo review of the inmate's suitability for
parole." (*In re Shaputis* (2008) 44 Cal.4th 1241, 1258 (*Shaputis
I*); accord, *In re Rosenkrantz*, at pp. 660-661.) "Accordingly, the
Governor has discretion to be 'more stringent or cautious' in
determining whether a defendant poses an unreasonable risk to
public safety." (*Shaputis I*, at p. 1258.)

---

"special consideration to whether age, time served, and
diminished physical condition, if any, have reduced the elderly
inmate's risk for future violence."

Our review of the Governor's decision is "highly deferential." (*Lawrence, supra*, 44 Cal.4th at p. 1204; accord, *In re Shaputis II, supra*, 53 Cal.4th at p. 214.) We do not reweigh the evidence or ask whether the inmate is currently dangerous. (*Id*. at p. 221.) Further, it is irrelevant whether we would conclude the "'evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.'" (*Id*. at p. 210.) Instead, we "must consider the whole record in the light most favorable to the determination, . . . to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole." (*Shaputis II*, at p. 214.) We may reverse the Governor's decision "[o]nly when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion" that the inmate is not currently dangerous to society. (*Id*. at p. 211.)

Our standard of review "is unquestionably deferential, but certainly is not toothless," and it "must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights." (*Lawrence*, 44 Cal.4th at pp. 1210-1211; see *Shaputis II, supra,* 53 Cal.4th at p. 215.) "'[B]ecause the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety, and because the inmate's due process interest in parole mandates a meaningful review of a decision denying parole, the proper articulation of the standard of review is whether there exists "some evidence" demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory

25

factor of unsuitability.'" (*Shaputis II, supra*, 53 Cal.4th at p. 209.)

B.    *There Is Not "Some Evidence" To Support the Governor's Conclusion That Chan Poses a Current Danger to Public Safety*

As discussed, the Governor's decision that Chan continued to pose a current danger to public safety was based on the Governor's determination that Chan lacked insight into his life crime because he minimized his role in, and failed to take full accountability for, the jewelry store robbery.  "Some evidence" does not support the Governor's determination because Chan consistently provided a plausible alternative version of how the robbery transpired and otherwise took full responsibility for the crime.

"[T]he presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety."  (*Shaputis II*, *supra,* 53 Cal.4th at p. 218; accord, *In re Shaputis I, supra*, 44 Cal.4th at p. 1260 [petitioner's failure to "gain insight or understanding into either his violent conduct or his commission of the commitment offense" supported denial of parole]; see *Lawrence, supra*, 44 Cal.4th at p. 1227 ["under the circumstances of the present case—in which the record is replete with evidence establishing petitioner's rehabilitation, insight, remorse, and psychological health, and devoid of any evidence supporting a finding that she continues to pose a threat to public safety—petitioner's due process and statutory rights were violated by the Governor's reliance upon the immutable and unchangeable circumstances of her

26

commitment offense in reversing the Board's decision to grant parole"]; Cal. Code Regs., tit. 15, § 2402, subd. (b) [information relevant to suitability for parole includes "past and present attitude toward the crime"]; *id.*, subd. (d)(3) [circumstances tending to show suitability for parole include signs of remorse, including indications that the inmate "understands the nature and magnitude of the offense"].) "Evidence of lack of insight is indicative of a current dangerousness only if it shows a *material* deficiency in an inmate's understanding and acceptance of responsibility for the crime." (*In re Ryner* (2011) 196 Cal.App.4th 533, 548; see *In re Swanigan* (2015) 240 Cal.App.4th 1, 16 [lack of insight must be connected to the conclusion an inmate is currently dangerous].)

Inmates may show insight into their life crimes by admitting their participation in the crime and taking responsibility for their actions. However, section 5011, subdivision (b), provides, "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." (See Cal. Code Regs., tit. 15, § 2236 ["The board shall not require an admission of guilt to any crime for which the prisoner was committed."].) We recognize there is a tension between section 5011, subdivision (b), which prohibits conditioning a grant of parole on an admission of guilt, with the proper consideration of an inmate's insight into the inmate's role in the crime. The Supreme Court in *Shaputis II*, *supra,* 53 Cal.4th at page 216 addressed this tension: "It may be that when a denial of guilt is the *only* evidence of an inmate's lack of insight, and the denial is plausible, parole may not be denied on that basis. [Citation.] . . . [H]owever, . . . an *implausible* denial of guilt may support a finding of current

27

dangerousness, without in any sense requiring the inmate to admit guilt as a condition of parole. In such a case it is not the failure to admit guilt that reflects a lack of insight, but the fact that the denial is factually unsupported or otherwise lacking in credibility."

Accordingly, where an inmate refuses to accept the official version of how the crime occurred (typically in an appellate opinion), but the inmate's version is neither inherently improbable nor physically impossible, parole may not be denied on that basis. (See *In re Sanchez* (2012) 209 Cal.App.4th 962, 973 [Board improperly "enshrine[ed] the appellate opinion on direct review as 'the official record,'" rejecting inmate's account and concluding inmate's denial of official account showed lack of insight and continuing threat to public safety]; *In re Pugh* (2012) 205 Cal.App.4th 260, 269 (*Pugh*) ["an inmate's refusal to agree with the prosecution's version of the crime does not support a finding of lack of insight"]; *In re Twinn* (2010) 190 Cal.App.4th 447, 466 [some evidence did not support the Governor's finding the inmate lacked insight into his crimes where inmate's version of the crime "'was not physically impossible and did not strain credulity'"]; *In re Palermo* (2009) 171 Cal.App.4th 1096, 1112 [inmate's continued insistence that his shooting of the victim was unintentional and resulted from his foolishly playing with a gun he believed was unloaded, "was not physically impossible and did not strain credulity," and therefore, his denial of official account did not support Board's finding inmate remained a danger to public safety], disapproved on other grounds in *In re Prather* (2010) 50 Cal.4th 238.)[13]

_____

[13] The cases cited by the Attorney General are distinguishable because in those cases the inmates' versions of their life crimes

The Governor contends in his return that the facts set forth in Chinh's appellate opinion (attached to the return), as described in the Governor's decision, show that Chan "orchestrated a sophisticated armed robbery of a jewelry store in which three people were killed." Further, according to the Governor's written decision, Chan entered the jewelry store with the other robbers, attempted to rob the owner and Lee, and shot at the police officers. Thus, the Governor argues, there is some evidence that Chan, in minimizing his role, lacked insight into his life crime

were implausible and contradicted by evidence in the record. (See *In re Taplett* (2010) 188 Cal.App.4th 440, 450 [some evidence supported finding of lack of insight where evidence of inmate's conduct, including intentionally pursuing the victim even after her accomplice shot at the victim's vehicle, belied inmate's insistence she did not intend to kill]; *In re Shippman* (2010) 185 Cal.App.4th 446, 459-460 [some evidence supported Board's finding inmate lacked insight into root causes of why he murdered his third wife where inmate refused to acknowledge and take responsibility for his history of abusive and controlling conduct toward former wives]; *In re Rozzo* (2009) 172 Cal.App.4th 40, 57, 61 [some evidence supported finding of current dangerousness because life crime was particularly heinous and inmate's denial of racial motivation for crime was implausible in light of "strong" and "ample" evidence to the contrary, including inmate's own use of racial epithets during the crime]; *In re Smith* (2009) 171 Cal.App.4th 1631, 1638-1639 [aggravated circumstances of the life crime, inmate's earlier confession she was the main participant in the beating death of her two-year-old daughter, and failure to express remorse for her personal involvement in the beating was some evidence supporting the Governor's reversal of parole].)

29

and continued to pose a current danger to public safety.[14]  The Governor is correct that the appellate opinion describes Chan as the leader of the group (the "congeries of crooks") and places Chan inside the jewelry store during the robbery.  Other evidence in the record supports the Governor's factual recitation that Chan was inside the store during the robbery, including the comprehensive risk assessment prepared for Chan's 2011 disciplinary proceeding that describes the witness statement that placed Chan inside the jewelry store (the statement Chan removed from his file).[15]

However, there is no evidence to support other significant facts relied on by the Governor, including that Chan provided more than one gun used in the robbery (the "weapons"), entered the store with the other robbers, attempted to rob the Lees, or shot at the police officers.  Even the appellate opinion described

[14]     The Governor also submitted with his return the California Department of Corrections and Rehabilitation's legal status summary and the 2021 parole hearing transcript.  We recognize that because Chan was not a party to Chinh's appeal, he did not have an opportunity "to challenge any material flaws or omissions in the opinion."  (*People v. Woodell* (1998) 17 Cal.4th 448, 457)  However, the Governor had discretion to consider the facts in the opinion and to give it the weight the Governor deemed appropriate.

[15]     As discussed, the probation report recounted that Lee testified at trial that Chan was in the rear of the jewelry store during the robbery, and Lee used a broom in an attempt to stop Chan from escaping.  However, in Lee's letter to the Board, he did not identify Chan as the person he hit with a broom, instead saying he "hit someone with a broom."  And the appellate opinion identifies Chinh—not Chan—as the robber in the back stairwell that Lee tried to stop with a broom.

Chan as entering the store after the robbery commenced, to determine why his confederates had not come out of the store.

Moreover, Chan has consistently maintained since the time of sentencing that he was not the mastermind behind the robbery and was not inside the store at any time during the robbery. Further, the probation report cites the jurors' responses to the posttrial questionnaire, in which all but one of the jurors stated Chan was not the mastermind behind the robbery and was not inside the jewelry store during the robbery.[16] All but one of the jurors likewise responded that they gave "very little" weight to Huynh's testimony, the accomplice-turned-prosecution witness who testified against Chan and Chinh in exchange for full immunity.[17] It is unsurprising the jurors stated Huynh lacked

---

[16] The record does not reflect why the trial court sent the questionnaires to the jurors, nor is it clear the authority for doing so. Further, responses to a posttrial jury questionnaire would be inadmissible in certain contexts. For example, in the context of a challenge to a jury verdict, the questionnaire and responses would not be admissible to show the "mental processes [of a juror] by which [the verdict] was determined." (Evid. Code, § 1150, subd. (a); see *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1683 ["evidence about a jury's 'subjective *collective* mental process purporting to show *how* the verdict was reached' is inadmissible to impeach a jury verdict"].) However, Chan does not offer the responses to the questionnaire for the purpose of overturning the jury's verdict. Moreover, the People do not object to our consideration of the responses contained in the probation report. We therefore consider the questionnaire responses in determining whether there is any evidence to support Chan's account of the life crime.

[17] Because Chan and Chinh were on trial, and the other two accomplices were killed during the robbery, it is reasonable to

credibility given that he was an accomplice and testified in exchange for full immunity. (See *People v. Lyons* (1958) 50 Cal.2d 245, 265 [fact that accomplice testifies on promise of lesser charge or reduced sentence "furnish[es] the defendant with a powerful weapon for attacking the credibility of the inherently suspect witnesses"], disapproved on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 32-34; *People v. Price* (2017) 8 Cal.App.5th 409, 438, fn. 14 [same].) Although Lee did not have an incentive to provide false testimony, courts have recognized that "[e]yewitness identification, particularly of a stranger, is fraught with potential for mistake." (*In re Swanigan, supra*, 240 Cal.App.4th at pp. 19-20 [inmate's denial of the murder was not implausible notwithstanding eyewitness testimony that he was the assailant].)

*Pugh, supra*, 205 Cal.App.4th 260 is directly on point. There, the Governor reversed the Board's grant of parole to William Pugh, who shot and killed the roommate of Pugh's best friend, where Pugh "consistently maintained he shot the victim when he 'freaked out' after the victim made sexual advances toward him" but the Governor found Pugh's version was "inconsistent with the facts in the record." (*Id.* at p. 264.) The Governor relied on (1) the statement in the probation report that Pugh planned to confront the victim and "'duke it out'"; (2) statements from the victim's family denying the victim was gay; and (3) statements made by the deputy district attorney at Pugh's parole hearing claiming that when the victim answered

---

assume Huynh was the only accomplice who testified at trial as to the planning of the robbery. We therefore infer that the appellate opinion's characterization of Chan as "the leader of this congerie of crooks" was based on Huynh's testimony.

the door to his apartment, Pugh quickly shot the victim at the entrance to the residence. (*Ibid.*) The Governor concluded these differences, along with "'problematic psychological evaluations,'" showed Pugh lacked sufficient insight into his life crime. (*Id.* at p. 271.) The Court of Appeal reversed, observing that Pugh had been consistent in "his retelling of the events," and further, there was evidence supporting Pugh's version of the crime, including physical evidence corroborating Pugh's account that he shot the victim while sitting in a chair (not at the entrance to the residence). (*Id.* at pp. 268, 273-274.) Because Pugh's version was not inconsistent with the record, "no inference can be drawn from these facts [cited by the Governor] that Pugh is lying about what happened, and consequently no inference can be drawn that he is still dangerous." (*Id.* at p. 274.)

Similar to *Pugh*, Chan's version of the life crime did not change over time, and it was supported by evidence in the record. Given the plausibility of Chan's version, the Governor could not properly draw a negative inference that Chan lacked insight based on discrepancies between Chan's version of the life crime and the official version. (*Shaputis II, supra*, 53 Cal.4th at p. 216; *Pugh, supra*, 205 Cal.App.4th at p. 269 ["an inmate's refusal to agree with the prosecution's version of the crime does not support a finding of lack of insight"]; *In re Hunter* (2012) 205 Cal.App.4th 1529, 1539-1540 [where inmate's version of the life crime remained consistent and was "'not physically impossible'" or "'strain credulity,'" there was "no basis for the inference that he lacks remorse or insight" or that he would "pose an unreasonable risk of future harm if granted parole"].)

Even assuming there is some evidence in the record to support the Governor's finding of Chan's lack of insight, there is

no evidence that Chan's lack of insight is rationally tied to the Governor's finding Chan is currently dangerous. (See *Shaputis II, supra,* 53 Cal.4th at p. 219 ["lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness"]; *In re Powell* (2010) 188 Cal.App.4th 1530, 1542 ["'"[L]ack of insight" is probative of unsuitability only to the extent that it is both (1) demonstrably shown by the record and (2) rationally indicative of the inmate's current dangerousness'"]; *In re Swanigan, supra,* 240 Cal.App.4th at p. 16 ["even assuming Swanigan failed to show insight," there must be "facts that connect that lack of insight to the conclusion that Swanigan is currently dangerous"].)

Significantly, Chan has taken full responsibility for his role in the life crime and the consequences of the crime. It is undisputed that Chan admitted to his active participation in the robbery and the ensuing murders by casing the jewelry store, providing a gun to Woo, and serving as one of the getaway drivers. And he took responsibility for "provid[ing] encouragement to [his] crime partners" and playing a key role with his "willing[ness] to fence the stolen merchandis[e] so [they] could all profit financially." Chan explained, "Without me, this robbery and the horrible murders could not have happened. I chose to play all these roles in the crime because I was greedy, I didn't care about the law and I had no concern for people impacted by the crime." He repeatedly expressed remorse in his testimony at the parole hearing, his written materials, and his psychological assessment. The psychologist noted Chan's "regret over the magnitude of the losses" was apparent during her evaluation of him. "Where, as here, undisputed evidence shows

34

that the inmate has acknowledged the material aspects of his or her conduct and offense, shown an understanding of its causes, and demonstrated remorse, the Governor's mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she remains currently dangerous." (*In re Ryner, supra*, 196 Cal.App.4th at p. 549; accord, *Shaputis II, supra,* 53 Cal.4th at pp. 227-228.)

Further, notwithstanding the Governor's acknowledgment that "[t]he law does not require that Mr. Chan admit guilt for action he did not commit," the Governor's decision runs afoul of this principle and section 5011, subdivision (b). (See *In re Jackson* (2011) 193 Cal.App.4th 1376, 1391 [Board's decision violated section 5011 and section 2236 of title 15 of the California Code of Regulations because "the only basis for the Board to conclude Jackson lacked insight, failed to take responsibility, and lacked remorse was his refusal to admit guilt for the commitment offense, [and] the Board indirectly relied on that refusal to deny Jackson parole"].) Chan has admitted he is guilty of the life crime but consistently refused to admit he played a more significant role as the leader and master planner. We cannot imagine what Chan could have done to show more insight into the life crime given the Governor's reliance on the official version, without admitting he had a greater role than what he has consistently maintained. As the Court of Appeal explained in *In re Perez* (2016) 7 Cal.App.5th 65, 88, in reversing the Board's denial of parole to an inmate who refused to admit to committing the life crime, it is "difficult to imagine what else petitioner could have said about his motivations and escalating criminality, as well as the growth in his understanding and perspective over the

35

years, to convince the Board that he had insight into his youthful criminality."

We recognize that Chan's conduct in removing a witness statement from his central file in 2011 is troubling, and at least in 2011, would have provided some evidence of his lack of insight into the life crime. Chan explained at the parole hearing that at the time he felt wronged by the statement placing him inside the jewelry store because the jury had rejected that fact. Further, he was unable to "trust the process," and he allowed his emotions to play a role in making the wrong choice. Chan admitted his guilt at the RVR hearing, and at the 2021 parole hearing Chan acknowledged he "was wrong" to remove the statement and the incident caused him to recognize his need to continue addressing lingering emotional problems. Moreover, by the time of the 2021 parole hearing, more than 10 years had passed since Chan had removed the witness statement, and since that time Chan had engaged in extensive self-help efforts, including programming to identify his rationalization and minimization of his conduct to justify his wrongful actions.

"[P]rison discipline, like any other parole unsuitability factor, 'supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness.' [Citation.] Not every breach of prison rules provides rational support for a finding of unsuitability." (*In re Hunter, supra*, 205 Cal.App.4th at p. 1543; see *In re Palermo, supra*, 171 Cal.App.4th at p. 1110 ["Nothing in the record supports a conclusion that [inmate] poses a threat to public safety because he once engaged in the unauthorized use of a copy machine, once participated in a work strike, and once was found in possession of a fan stolen by his roommate."]; cf. *In re Reed* (2009) 171 Cal.App.4th 1071, 1085

36

[recent misconduct violated specific directive from the Board given it occurred only two months before and "was not an isolated incident; instead, it was part of an extensive history of institutional misconduct"].)  The non-violent nature of Chan's rules violation committed more than 10 years prior to the parole hearing, during which period he engaged in extensive programming to address his need to take responsibility for his actions, was not rationally indicative of Chan's current dangerousness.[18]

---

[18]    The Governor also observed that Chan denied knowing guns would be used in the robbery despite "furnishing the group with weapons."  As discussed, there is no evidence that Chan provided more than one gun used in the robbery.  Further, Chan's statement denying that he knew guns would be used in the robbery was in the context of his explaining at the 2021 parole hearing that he was previously in denial but now recognized he "should have known, [he] knew better."

## DISPOSITION

Chan's petition for writ of habeas corpus is granted. The Governor's decision reversing the Board of Parole Hearings' June 11, 2021 decision finding Chan suitable for parole is vacated, the grant of parole is reinstated, and the Board is directed to conduct its usual proceedings for release on parole.[19]

FEUER, J.

We concur:

PERLUSS, P. J.          SEGAL, J.

---

[19] We recognize that in the time since the Governor's 2021 decision, circumstances may have changed that affect Chan's suitability for parole. (See *In re Prather* (2010) 50 Cal.4th 238, 258 ["a judicial order granting habeas corpus relief implicitly precludes the Board from again denying parole—unless some *additional* evidence (considered alone or in conjunction with other evidence in the record, and not already considered and rejected by the reviewing court) supports a determination that the prisoner remains currently dangerous"].) The Board retains discretion to decide, after following the appropriate procedures, whether existing circumstances support the release of an inmate on parole. (See *In re Caswell* (2001) 92 Cal.App.4th 1017, 1026 ["Even after parole is granted, the Board is authorized to rescind the grant of parole, if unexecuted, for good cause after a rescission hearing."]; Cal. Code Regs., tit. 15, § 2450.)

38